**POLYSIUS CORP. and Dr. Klaus Schonert, Plaintiffs,**

v.

**FULLER COMPANY, Defendant, and Plaintiff on the Counterclaims,**

v.

**KRUPP POLYSIUS A.G., a corporation of the Federal Republic of Germany, Defendant on the Counterclaims.**

Civ. A. No. 86–3381.

United States District Court,
E.D. Pennsylvania.

Feb. 3, 1989.

As Corrected March 8, 1989.

James H. Cox, Edward H. Nicholson, Jr., Todd Deveau and James F. Vaughan, Hurt, Richardson, Garner, Todd & Cadenhead, Atlanta, Ga., for plaintiffs.

John C. Vassil, New York City, for defendant.

## OPINION

CAHN, District Judge.

In this complex patent litigation, plaintiffs seek declaratory and injunctive relief pertaining to United States Patent No. 4,357,287 which sets forth a method for reducing the size of brittle minerals. Plaintiffs also claim entitlement to counsel fees for the allegedly willful and deliberate conduct of the defendant.[1] The defendant denies infringement and raises the defenses of patent invalidity, patent misuse, and fraud on the Patent Office. Defendant claims entitlement to counsel fees relating to the defense of the infringement count. The defendant also seeks money damages on its counterclaim for alleged antitrust and unfair competition violations.

The case was heard non-jury in February, March, and July of 1988. The parties, through counsel, have presented extensive closing arguments to the court and have filed post argument briefs as well as requests for findings of fact and conclusions of law. I make the following:

## A. FINDINGS OF FACT

1. The plaintiffs are:

(a) Polysius Corp. ("Polysius"), a Georgia corporation with its principal place of business in Atlanta, Georgia;

(b) Dr. Klaus Schonert ("Schonert"), a citizen of West Germany and the owner of U.S. Patent No. 4,357,287 (the '287 patent).

2. The defendant is Fuller Company ("Fuller"), a Delaware corporation with its principal place of business in Bethlehem, Pennsylvania.

3. The counterclaim defendant is Krupp Polysius A.G. ("Krupp Polysius"), a West German corporation. Polysius is a wholly-owned subsidiary of Krupp Polysius.

4. On February 17, 1978, Schonert filed a patent application in the United States Patent and Trademark Office for a "Method of Fine and Very Fine Comminution of Materials Having Brittle Behavior."

5.(a) Prior to the filing of the United States application, Schonert granted a non-exclusive license to Krupp Polysius[2] under a pending German patent application for the same method;

(b) Krupp Polysius thereafter embarked on a research and development program to design and manufacture equipment capable of carrying out the Schonert process. This program resulted in the development of a high pressure roll press marketed under the trade name "Polycom";

(c) In 1979, a German firm, Klockner–Humboldt–Deutz ("KHD") instituted an Opposition Proceeding to Schonert's application in the German patent office;

(d) In 1985, Schonert, Krupp Polysius, and KHD entered into agreements which provided:

---

**1.** Plaintiffs have withdrawn their claim for monetary damages.

**2.** This license was actually granted to Polysius A.G., a predecessor firm of Krupp Polysius.

(i) KHD will withdraw its opposition to the issuance of the German patent;

(ii) Schonert will authorize Krupp Polysius to sub-license KHD to use the patented process;

(iii) Schonert will not grant further licenses without the prior approval of Krupp Polysius;

(iv) Krupp Polysius will not grant further sub-licenses without the prior approval of KHD;

(v) Krupp Polysius will not authorize Schonert to grant additional licenses without the prior approval of KHD;

(vi) Krupp Polysius and KHD will share expenses in regard to enforcing the patents for the Schonert process;

(e) KHD withdrew its opposition and the German patent issued.

6. On November 2, 1982, the '287 patent was issued to Schonert by the United States Patent Office.

7. The '287 patent discloses and claims a process to comminute brittle material. The patent describes a process for fine and very fine comminution of brittle material in two steps. First, a bed of materials is compressed between non-yielding surfaces in a single pass at a pressure of at least $500\text{kg/cm}^2$. At such pressure the material is comminuted but is also agglomerated into flakes resembling pancakes. Second, the flakes are deagglomerated to release the fine material.

8. The major advantage of the '287 patent is significant energy savings (generally in the form of reduced electrical costs) for firms in the mineral, mining, and cement industries.

9. In the spring of 1985, Fuller sent a member of its engineering staff to meet with Schonert in Germany.

10. In June of 1985 Schonert met with the Fuller representative and explained his process in detail.

11. Thereafter, Fuller requested a license from Schonert under the '287 patent.

12. In July of 1985 Krupp Polysius refused to allow Schonert to license Fuller under the '287 patent.

13. Thereupon, Fuller embarked on a program to develop equipment to compete with Polysius and others.

14. In June of 1985 Fuller's Research and Development Department purchased a used Allis Chalmers compactor ("the A–C compactor") and modified it as follows:

(a) a feed hopper was installed to create a bed of material above the rollers of the compactor;

(b) a 50 horsepower motor was incorporated rather than the 40 horsepower motor which was standard for this A–C compactor;

(c) the 8 inch roll width was reduced to 6 inches;

(d) devices were incorporated into the circuit to provide deagglomeration after the compaction step.

15. In August of 1985 Fuller used the rebuilt A–C compactor to carry out the Schonert process. Fuller used this equipment to analyze cement clinker samples obtained from prospective customers in an effort to sell high-pressure roll crusher equipment.

16. Fuller's test procedure included stressing the brittle material provided by prospective customers by processing it through the counter-rotating cylindrical rolls of the A–C compactor in a single pass at pressures in excess of $500\text{kg/cm}^2$ which were sufficient to comminute the material. The agglomerates formed by this process were then disintegrated in subsequent steps.

17. In November of 1985 Fuller presented a seminar to the mineral and mining industries at its home office wherein the operation of the A–C compactor circuit was demonstrated and explained to those in attendance. A brochure was also distributed entitled "Fundamentals of the Clinker Preliminator." This brochure was written by the engineer who visited Schonert.

18. Fuller prepared a videotape of the operation of the A–C compactor circuit. Upon advice of one of its patent lawyers, the audio portion of this videotape was erased.

19. Fuller designed and developed equipment for the express purpose of selling the equipment to carry out the Schonert process. Fuller's equipment is known as the Fuller HRC.

## B. DISCUSSION

The parties raise a plethora of issues all of which must be considered and discussed. The threshold issue, however, is the validity of the '287 patent.

### 1. *The '287 Patent is Valid*

a. *The language of the '287 patent complies with 35 U.S.C. § 112.*

The first task in an adjudication of the issues of patent validity and infringement involves a consideration of the language of the patent in suit. Claim 1 of the '287 patent reads as follows:

1. In a method for comminution of particles of brittle materials to obtain product of fine particles the maximum particle size of which is approximately in the range of 2 um–1000 um comprising:

(a) stressing a bed of bulk coarse material containing particles of the brittle material to be comminuted which are of a size larger than the fine particles to be obtained, between non-yielding hard surfaces to thereby obtain comminution of the coarse particles into finer fragments along with a agglomeration of finer fragments; and

(b) subsequently disintegrating the resulting agglomerates to obtain the product containing the fine fragments, the improvement comprising:

(c) carrying out said stressing of said bed of material by subjecting said bed to a pressure of at least $500kg/cm^2$ between said non-yielding surfaces; and

(d) carrying out said stressing in a single pass, whereby the total energy required [sic] comminute said particles will be substantially reduced.

The remaining claims alleged by plaintiffs to be infringed by Fuller are dependent upon Claim 1. Claim 2 discloses and claims the method of Claim 1, the difference being that Claim 2 requires pressure of at least $800kg/cm^2$. Claims 10 and 11 disclose and claim the method according to Claim 1, further specifying that the stressing referred to in Claim 1 be carried out using, respectively, a roller mill with cylindrical rotors and a roller briquetting press. Claims 15 and 16 disclose and claim the method according to Claim 1 with the deagglomeration being accomplished by, respectively, combined compression—sheer stressing and stressing in a ball mill. Claim 18 specifies that the method according to Claim 1 be carried out on such materials as cement clinker. Claim 19 discloses and claims a method according to Claim 18, specifying that the deagglomeration step take place in a ball mill. Claim 24 discloses and claims the method according to Claim 1, specifying that at least 30% of the fragments obtained after the deagglomeration step be in the size range of the final product.

35 U.S.C. § 112 provides in part:

The specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, ... to make and use the same, and shall set forth the best mode contemplated by the inventor of carrying out his invention.

Section 112 requires the inventor to describe in the specification how the invention set forth in the claims actually works. The specification should explain what is new about the invention. This description and explanation must be sufficient to enable a person with skill in the field covered by the invention[3] to replicate it without undue experimentation. This description must

---

3. In determining whether one of ordinary skill in the art could use or replicate the process for the '287 patent, the parties are generally in agreement that the ordinary level of skill includes an undergraduate degree in mineral engineering plus five years of experience or a master's degree in the subject plus one year of experience. The parties to this case have not differentiated the skill level for Section 112 purposes from the level referred to in Section 103. There is authority, however, that the levels are different. 2 D.S. Chisum, Patents § 7.03[2][b] (1978 rev.1987).

**566**

disclose the most advantageous method for carrying out the claimed invention.

 Reference to Figures 4, 5a, and 5b in the '287 patent and the text relating to them will provide sufficient information to decide whether Schonert has met the Section 112 requirements.

Fig. 4

Fig. 5a

Fig. 5b

FIG. 4 shows how the compression force F, roller diameter D, roller axial length L, and maximum grinding pressure $P_m$ which acts on the bed in the narrowest section of the nip are inter-related in accordance with the following equation:

$$F/LD = ka_oP_m$$

wherein:

$a_o$ = angle at which the stressing begins and

K = a constant dependent on the material behavior and having a value of about 0.2 in general.

The method according to the invention necessitates that the grinding pressure be selected high enough that a distinct formation of agglomerates or briquettes takes place. In general this requires the grinding pressure $P_m$ to be increased to more than 500 kg/cm$^2$ or 7000 psi. The compression force of the rollers per meter of roller length (F/L) results, in accordance with the above equation, as being proportional to the roller diameter D and the chosen angle $a_o$. For the value F/L = 200000 kg/m given above and for D = 100 cm, $a_o$ = 0.1 (corresponding approximately to 6º), and k = 0.2, a grinding pressure of $P_m$ = 1000 kg/cm$^2$ or 14000 psi results.

Tests have shown that the method according to the invention permits considerable savings of energy. In the production of normal Portland cement PZ275 the comminution requires only from 10 to 20 kWh/t instead of 25 to 35 kWh/t. The new method can be carried out in a plant of the type illustrated by the block or flow diagram of FIG. 5a. It consists of a mill 16 called GWM. Mill 16 is a roller mill for grinding a bed of bulk material, for instance, a roller mill having two cylindrical rollers driven in a counter rotating sense, such as shown in FIGS. 2 and 4, or another type of roller mill; a ball mill KM 17, and an air classifier K1 18 having its separation limit $x_{tr}$ at 60 um. The pre-crushed material, all the particles $x_a$ of which are smaller than 2.5 mm, is supplied to mill 16 at a feed rate M and the recycled coarse material from the air classifier K1 18 is supplied to the mill 16 at a feed rate $M_g$. The stressing between the rollers effects comminution and briquetting. The resulting product is compressed to flake-shaped briquettes which are disagglomerated or disintegrated in the ball mill 17 connected downstream. The product leaving the ball mill contains approximately 40% of particles which are smaller than 60 um. The air classifier K1 18 separates the major part thereof into an end product which leaves the mill-classifier circuit at a product rate M. The recycled coarse material is mixed with the pre-crushed feed material and again supplied to roller mill 16. The total flow rate M* through the mill is divided by the air classifier K1 18 into two fractions, the fine fraction leaving the circuit at the product rate M = p'M*, the coarse fraction rate being recycled at a flow rate (1–p')M*. If the product rate is assumed, for example, to be M = 100 t/h and p' = 33%, the flow rate through the mill and the air classifier will be M* = 300 t/h. The energy required by the roller mill 16 for the bed of bulk material amounts to 3.1 kWh/t and that of the ball mill 17 amounts to 1.4 kWh/t. The sum of both is 4.5 kWh/t. The specific energy consumption of the circuit based on the production rate is calculated to amount to approximately 13.6 kWh/t. If, furthermore, 20% of the gross energy input is considered to the [sic] lost in the engine transmission, and machines, the resulting specific energy consumption will be about 17 kWh/t.

FIG. 5b shows a block flow diagram of plant comprising two roller mills for grinding a bed of bulk material, GWM1 19 and GWM2 20, one ball mill 21, and two air classifiers K11 22 and K12 23. Subdividing the stressing of the bed of bulk material into two steps establishes an advantage from the point of view of the process technique and may also be favorable with respect to the overall economy.

When applying the novel method, the finest comminution of limestone to a

product of which 100% is smaller than 10 um requires compression of about 1,500 kg/cm$^2$ (2,000 psi) and only about 10 kWh/t. Optimum operating conditions can be found for every task. For example, the pulverization of cement is most economical at grinding pressure between 1000 kg/cm$^2$ or 15,000 psi and 2,500 kg/cm$^2$ or 35,000 psi.

Fuller maintains that the claims and specification do not meet the requirements of Section 112. Fuller claims that all of the product obtained following the deagglomeration step (KM–17 in Fig. 5a and KM–21 in Fig. 5b) must be in the size range of 2 microns to 1000 microns. According to Fuller, if some of the product following the deagglomeration step exceeds 1000 microns in size, there would be no infringement of the '287 patent. As a corollary to this argument, Fuller urges that if the '287 patent is interpreted so that some of the product following the deagglomeration step may exceed 1000 microns in size, then one would be unable to ascertain at what point he would be infringing the patent. With this approach, Fuller hopes to place the plaintiffs on the horns of a dilemma. If the 2 to 1000 micron range in Claim 1 is absolute, then Fuller could avoid the patent by arranging its operation so that some of that product exceeds 1000 microns in size. On the other hand, if Claim 1 is interpreted so that some of the product following the deagglomeration step may exceed 1000 microns in size, then the claims are too indefinite and violate Section 112.

I hold that the reference in Claim 1 is to an *approximate* range of 2 to 1000 microns.

Fuller emphasizes in Claim 1 of the '287 patent that the stressing is carried out in a single pass. Fuller urges that the 2 to 1000 micron range set forth in Claim 1 must be achieved in the first pass through the high-pressure roll press without recirculating particles larger than 1000 microns for further comminution.

There are several serious problems with Fuller's interpretation. In the first place, Claim 1 qualifies the 2 to 1000 micron range by using the word "approximately."

Second, Fuller's interpretation is totally impractical. The precise range of fineness of the product following the deagglomeration step has little or nothing to do with the novelty of the '287 patent. The '287 patent, contrary to prior mineral engineering practice, teaches that high-pressure stressing of a bed of materials between non-yielding surfaces is an energy saving comminution technique, even if agglomerates are formed. The prior practice was to avoid the formation of agglomerates because the sole purpose of comminution is to achieve a reduction in size and the formation of agglomerates, it was thought, defeats that purpose. *See* Record at 8.131.

Schonert discovered that the pancake-like agglomerates formed when brittle material is stressed in accordance with the '287 patent can easily and efficiently be deagglomerated. Fuller's emphasis on the precise range of fineness for the product following deagglomeration is misplaced. It makes no difference if some of the product following deagglomeration is in a range of fineness that exceeds 2 to 1000 microns. Fuller is being entirely too literal in insisting that the patent be read so that no further comminution may take place following the deagglomeration step. In commercial grinding applications it is customary for oversize fragments to be recirculated through the comminution process. In fact, Fig. 5a and Fig. 5b illustrate classification equipment which will recirculate oversize material through the high-pressure roll press. In Fuller's view, if any of this material exceeds 1000 microns in size, there could be no infringement of the '287 patent. Fuller argues that recirculation of product in excess of 1000 microns would violate the single pass concept of Claim 1.

I see no reason to find non-infringement in the situation where an operator utilizing the concepts of the '287 patent adjusts his equipment so that some product following deagglomeration is more than 1000 microns in size and is subsequently classified and recirculated to reduce it to a smaller final product size. Instead, I think the correct interpretation of the '287 patent is that the 2 to 1000 micron range is merely approxi-

mate. Otherwise, it would be ridiculously easy to circumvent the patent by adjusting the operation to produce a small amount of product following deagglomeration to be in excess of 1000 microns in size.

Fuller has hypothecated in its cross-examination of plaintiff's patent law expert and in its post-argument briefing certain situations where, if plaintiff's interpretation is adopted, a potential infringer would have difficulty in determining at what point he would infringe the '287 patent. Fuller asks the rhetorical question: "Would a comminution process be within Claim 1 if the amount of fines in the product exceeds the amount of fines in the feed by 10 percent and the purported energy savings is in the order of 5 percent?" The answer is obviously "no", unless the process utilizes the stressing of a bed of brittle material between unyielding hard surfaces at a high pressure with subsequent deagglomeration and with almost all of the comminution occurring in the first pass. This hypothetical inquiry as well as the other rhetorical questions asked by Fuller in its post argument briefing illustrate the lack of practicality with Fuller's position. What is important here is the concept that high pressure grinding of a bed of materials will result in substantial energy savings and a product following deagglomeration with most of the particles being of a size less than 1000 microns.

"Further, claims should be so construed, if possible, as to sustain their validity." *ACS Hosp. Systems v. Montefiore Hosp.*, 732 F.2d 1572, 1577 (Fed.Cir.1984). Fuller's attempt to avoid the '287 patent on the ground that the patent applies only if all of the product following the deagglomeration step is 1000 microns in size or smaller is unpersuasive and will be rejected.

■ Fuller maintains that the best mode for carrying out the Schonert invention is not disclosed in the '287 patent. Reference to the patent itself, as well as reference to the extensive evidence of the utilization of the Schonert process, establishes that the best mode appears to be the use of hydraulically operated counterrotating roll presses with subsequent deagglomeration in a ball mill. Schonert has fully and candidly disclosed this mode. Also, there is no evidence of concealment by Schonert of a better mode not disclosed in the '287 patent. *See Hybritech, Inc. v. Monoclonal Antibodies, Inc.*, 802 F.2d 1367, 1384 (Fed.Cir. 1986), *cert. denied*, 480 U.S. 947, 107 S.Ct. 1606, 94 L.Ed.2d 792 (1987).

**b. *The prosecution history of the '287 patent.***

■ The discussion in this section will be limited to a review of the prosecution history related to Fuller's contention that all of the product size following deagglomeration must be in the range of 2 to 1000 microns.[4]

In an amendment filed with the United States Patent and Trademark office in late 1981, Schonert, after thanking the examiner for granting his United States and German attorneys an interview, stated:

As discussed with the examiner at the interview, the claims have been completely rewritten. Claim 47, (now Claim 1) the independent claim replacing Claim 22, has been written in Japson [sic] format. In addition to specifically pointing out the steps which comprise the present invention, the claim has been limited to the range of 2 um to 1000 um. This avoids any indefiniteness by what was previously defined as fine or very fine.

In the preceding section I held that not all of the product following the deagglomeration step must be in the 2 to 1000 micron range. The prosecution history does not undermine this holding. My interpretation of the range in Claim 1 is consistent with dependent Claim 24. Claim 24 states:

24. The method according to Claim 1 comprising selecting the compression force for carrying out said stressing to be of sufficient magnitude so as to result in at least 30 percent of the fragments obtained having the desired degree of fineness of the final product.

---

**4.** The prosecution history of the '287 patent will also be considered in those sections dealing with obviousness (B.1.c.) and inequitable conduct (B.1.d.).

Claim 24 refers to applying a compression force of sufficient magnitude so that 30 percent of the product following deagglomeration would be as small or smaller than the desired degree of fineness for the end product. In Fig. 5a of the patent, for a process to meet Claim 24, 30 percent of the fragments following step 17, the deagglomeration step, must be smaller than 60 microns.

Claim 24 is dependent upon Claim 1. Both sides use the dependency of Claim 24 to support their respective positions on the maximum size of the product following deagglomeration. Plaintiffs urge that if one assumes a desired final product size following classification of 1000 microns, then to meet Claim 24, 30 percent of the product following deagglomeration must be at least that small. But, conversely, 70 percent of the product following deagglomeration would then be over 1000 microns in size. Consequently, plaintiffs maintain that the 2 to 1000 micron range in Claim 1 is approximate and not absolute because otherwise, Claim 1 could become more narrow than Claim 24, which by definition is not possible.

Fuller buttresses its position that no product size following deagglomeration may exceed 1000 microns by claiming that Schonert agreed to the 2 to 1000 micron range to comply with the Patent Examiner's desire to quantify what Schonert meant by "fine or very fine". According to Fuller, it is more logical to assume a desired final product size of 75 microns and that Claim 24 would then require 30 percent of the product following deagglomeration to be 75 microns or less with the remaining 70 percent of that product being in the range of 75 to 1000 microns, but in no event any larger. While there is some merit to Fuller's position, it runs contrary to common sense and industrial practices. This court will not strain to interpret patent claims so that a patent holder is denied the fruits of his labor on technicalities. As

stated, infra, it would be a travesty to allow Fuller or others to avoid the '287 patent by adjusting the operation to produce product at the deagglomeration stage larger than 1000 microns in size.

c. *The '287 patent is not obvious under 35 U.S.C. § 103.*

In determining whether the teaching of a patent is obvious, I should make the factual determinations required by *Specialty Composites v. Cabot Corp.*, 845 F.2d 981, 989 (Fed.Cir.1988) which are "(1) the scope and content of the prior art; (2) the differences between the prior art and the claims at issue; (3) the level of ordinary skill in the art at the time when the invention was made; and (4) objective evidence of nonobviousness."

■ The primary dispute between Fuller and Polysius is whether or not *Taggart*[5] contains data that makes the teaching of the '287 patent obvious. Consequently, I will review Fuller's contention that *Taggart* discloses the teaching of the '287 patent. I will then turn my attention to whether or not other prior art renders the '287 patent obvious. On the issue of obviousness, Fuller has the burden of proof.[6]

■ *Taggart* contains over 1000 pages relating to comminution technology. Fuller concentrates on two particular references in *Taggart* which, in its view, suggest that roll presses, operating at high pressures, have been used to comminute minerals which are then further comminuted (deagglomerated) in a ball mill. *Taggart*, in considering preliminary reduction, at page 6–45 states:

On Clinker (Table 20) there was an increase of 30 percent in capacity of a mill consuming 400 hp., or a saving of 7.2 hp-hr. per ton, by reason of a preliminary reduction through the range from $<\sqrt[3]{4}$ in. to $<$6–m. Such reduction can be done for half or less of this cost in a fine crusher. The difference was even more

---

**5.** A. Taggart, *Handbook of Mineral Dressing* (1945). This opus will hereinafter be referred to as *"Taggart."*

**6.** *See American Hoist & Derrick Co. v. Sowa & Sons,* 725 F.2d 1350, 1358 (Fed.Cir.), *cert. denied,* 469 U.S. 821, 105 S.Ct. 95, 83 L.Ed.2d 41 (1984).

striking in the case of limestone (Table 21). Table 18, item 213, shows a saving of slightly more than 50 percent in power consumption with a small tumbling mill for reduction in feed size from <2 in. to <20-m.

Fuller urges that this reference in *Taggart* is proof positive that fine crushing prior to use of a ball mill was a known method to achieve energy savings. Fuller's contention, however, is in error because it has not carefully read *Taggart*. The next sentence in *Taggart* states:

> A large part of this saving would have been made if the feed-size reduction had been to ¼ inch only (see Table 21), and the relatively costly preliminary reduction from <¼ in. to <20-m. could thus have been saved.[7]

It is obvious that *Taggart* does not teach fine comminution before the use of a ball mill for deagglomeration. What *Taggart* says is that a preliminary crusher placed in an operation before a ball mill can result in power savings especially if the preliminary reduction is limited to bringing the size of the feed to less than ¼ inch.

The '287 patent teaches a much different concept. Schonert discovered that fine and very fine comminution takes place when a bed of materials is stressed at high pressure in a roller press. Rather than breaking minerals down to a size of ¼ inch for optimum energy savings, Schonert intends to break the size of the materials down to less than 1000 microns. 1000 microns equals .04 inches. This is six times smaller than the ¼ inch size which *Taggart* found to be optimum. I reject, therefore, Fuller's suggestion that *Taggart* at 6–45 makes the '287 patent obvious.

■ Another major thrust of Fuller is that item no. 19 in Table 24 at page 4–62 of *Taggart* discloses a spring loaded roll press which comminutes a bed of ore under high pressure with the formation of agglomerates. In my view Fuller's argument is based on convoluted reasoning but, nevertheless, deserves careful analysis. In reviewing the specifications for item 19, Fuller's experts have opined that this machine exerts very considerable forces on the ore it is crushing. Although Table 24 does not state the spring pressure for this machine, Fuller's experts refer to Table 23 at 4–56 of *Taggart* which contains "selected catalogue data" preceding 1945. According to this table, some manufacturers produce a spring-loaded roll press with the same roll dimensions as item 19 with spring pressure of 4000 to 10000 pounds per lineal inch. Relying on both calculations and their expertise, Fuller's experts opine that the product from this spring-loaded roll press will result in the formation of agglomerates. Thus, Fuller says the process described in item 19 is substantially the same process which Schonert claims to have invented.

Polysius responds to this argument by noting that the horsepower for the spring-loaded roll crushers listed in Table 23 are approximately ten times less than the horsepower required to operate similar sized roll presses utilizing the '287 patent. For example, a spring-loaded roll crusher with rolls 48 inches in diameter by 20 inches in length had a motor horsepower of 65 in accordance with the catalogue data found in Table 23. The installation Fuller provided to Lehigh Portland Cement Company (a firm which is licensed to use the '287 patent and where the teaching of the '287 patent was applied) utilizes motor horsepower of 1000 for rolls 48 inches in diameter by 30 inches in length. Polysius then adjusts the horsepower for the spring-loaded roll press to 97 assuming the length of the rolls is increased from 20 to 30. Thus Polysius urges that the data in *Taggart* illustrates an entirely different technology because ten times the horsepower is required for the Schonert process. Polysius contends, therefore, that the pressures generated in the spring-loaded roll press

---

**7.** <20-m in *Taggart* means less than 20 mesh. Mesh refers to screens of woven wire used to classify material and the arabic numeral(s) preceding the word mesh refer to the number of openings in the screen per a designated area such as one square inch. The larger the mesh designation, the smaller the material that will pass through the screen. Hence, a higher mesh number refers to smaller material.

applications are much less than 500 kg/cm $^2$ making it clear that the references in *Taggart* do not stress a bed of materials at high pressure. To support this position Schonert calculated that the relatively low horsepower referred to in the *Taggart* data could not generate 500 kg/cm $^2$ of pressure.

Utilizing Schonert's formula for calculating pressure, Fuller developed counter-calculations to establish that the spring-loaded roll press in item 19 did develop pressures in excess of 500 kg/cm $^2$. In its calculations, however, Fuller assumes that the spring-loaded roll press described in item 19 exerts a force per unit length of 4000 to 10000 pounds/inch. Since those forces have been obtained, not from Table 24 but from selected catalog data in Table 23, it is not at all clear to me that the spring-loaded roll crusher in item 19 actually exerts as much force as Fuller claims.

In addition, Fuller makes the interesting argument that, utilizing formulae derived by Schonert during his trial testimony, either the A–C compactor circuit does not exert sufficient pressure to come within the scope of the '287 patent (i.e. less than 500 kg/cm $^2$) or, if you apply the formulae in a manner Fuller deems consistent, the spring-loaded roll press in item 19 can, with a 50 horsepower motor, develop sufficient pressure to support the contention that the process contained in the '287 patent was carried out prior to 1945 with a spring-loaded roll press. I reject Fuller's counter-calculations. In the first place, I reject Fuller's invitation to infer that the spring-loaded roll press at item 19, with a motor consuming only 22 horsepower (see line 18 of Table 24 at item 19), exerts forces on a bed of materials of between 4000 to 10000 pounds/inch. Fuller's attempts to show that processes similar to the '287 patent were being carried out prior to 1945 are absurd. For example, the hydraulically operated A–C compactor circuit which Fuller installed at its factory has rolls with a diameter of 18 inches and a length of 6 inches. These rolls are driven by a 50 horsepower motor which at times drew current sufficient to generate 90 horsepower. According to Table 23 at page 4–56 of *Taggart*, a spring-loaded roll crusher with a diameter of 18 inches and a length of 10 inches would involve a spring pressure of 4000 to 5000 pounds per lineal inch utilizing an *8 horsepower motor*. The technology described in *Taggart* is entirely different than that utilized in the '287 patent.

■ I also reject the opinions of Fuller's experts that *Taggart* teaches agglomeration followed by deagglomeration, a basic premise of the '287 patent. Utilizing the data in Tables 23 and 24 of Chapter 4 of *Taggart*, Fuller's experts opine that sufficient pressures are generated to cause agglomeration which must then be followed by some deagglomeration step. These opinions are based on the spring pressures enumerated in Table 23. After comparing these opinions with counter opinions expressed by experts for Polysius and after an independent review of the bases expressed for the various opinions, I hold that *Taggart* in no way teaches agglomeration of minerals by stressing same in a bed of materials under high pressure between non-yielding counter rotating rolls with a subsequent deagglomeration step. Certainly, the preliminary grinding referred to at page 6–45 of *Taggart* is not the '287 process by any stretch of the imagination. Fuller has simply failed to meet the burden of proving that the prior art in *Taggart* renders the '287 patent obvious.

Fuller has urged that numerous other examples of prior art make the '287 patent obvious. After a thorough review of this prior art, I hold that none of it singly discloses the process discovered by Schonert. Although certain steps in the '287 patent may be similar to certain steps in related processes, no one except Schonert had the genius to combine these separate elements into the teaching of the '287 patent.

The parties are in general agreement that the Section 103 level of skill in the art at the time the invention was made is either a Bachelor of Science degree in Mineral Engineering with five years of field experience or a Master of Science in Mineral Engineering with at least one year of field

experience. Engineers with this training would not find the Schonert process in *Taggart.*

■ There is overwhelming objective evidence of nonobviousness in this case. The most telling objective indicator of nonobviousness is that the Fuller engineers, when they heard of that "German professor," did not go to *Taggart* or any of the prior art cited by Fuller in this case. Instead Fuller's engineer went directly to that "German professor" who gave him a mini-course in the process of the '287 patent. The engineer's notes have been received into evidence in this case and form the basis for a Fuller paper entitled "Fundamentals of the Clinker Preliminator."

Another objective indication of nonobviousness is that Schonert received the prestigious Gaudin award from the Society of Mining Engineers, a branch of the American Institute of Mining, Metalurgical Engineers. The Gaudin award symbolizes international recognition for outstanding technical innovation. Fuller urges that the text of the award speaks in terms of the patenting and development of high pressure grinding rolls. Thus, Fuller urges that the Gaudin Committee lacked a fundamental understanding of Schonert's contribution through the '287 patent in that what is patented therein is a process and not a machine. After reviewing the selection method and the explanation given for the text of the award, I am convinced that Schonert's peers placed him on a high pedestal for the invention of the process and that the terms of the citation do not undermine this recognition. The chairmen of the Gaudin Award Selection Committee described Schonert's work as "revolutionary."

In addition, the '287 patent fulfills an industrial need to reduce power requirements in the comminution of minerals. The comminution of minerals in an industrial society consumes a significant amount of electrical power. As power costs rose, the need for a more efficient comminution technique became greater. This need represents an objective indication of nonobviousness.

The '287 patent has enjoyed considerable commercial success. There are approximately 70 applications of the Schonert process throughout the world.

The objective evidence of nonobviousness supports not only my holding that the prior art does not render the '287 patent obvious but also the conclusions I have reached in other sections of this opinion.

d. *Schonert did not engage in inequitable conduct which would invalidate the '287 patent.*

■ Fuller claims that Schonert and his representatives before the Patent Office intentionally withheld material information from the Patent Examiner and that this inequitable conduct invalidates the '287 patent. Fuller has the burden of proving this defense by clear and convincing evidence. *J.P. Stevens & Co. v. Lex Tex Ltd.,* 747 F.2d 1553 (Fed.Cir.1984), *cert. denied,* 474 U.S. 822, 106 S.Ct. 73, 88 L.Ed.2d 60 (1985). To establish inequitable conduct there must be proof of material misrepresentations or omissions coupled with an intention to mislead the patent examiner. If basic levels of materiality and intent are proved, then I need to consider the degree of materiality and the degree of intent in determining if the inequitable conduct defense is met. A high degree of intent can offset a low degree of materiality and vice versa. *American Hoist & Derrick Co.,* 725 F.2d at 1363.

■ Fuller has difficulty with both prongs of the inequitable conduct defense. Schonert is a scholar of high repute. Scholars do not engage in intentional misrepresentation. I find that Schonert is a scholar of the first order, that his testimony is highly credible, and that neither he nor his representatives engaged in intentional or grossly negligent deception before the Patent Office. Nevertheless, Fuller urges that in three areas Schonert and his representatives engaged in inequitable conduct. These areas involve: (1) failure to call *Taggart* and other prior art to the attention of the patent examiner; (2) mischaracterization of a Russian patent before the patent examiner; and (3) failure to

disclose the opposition of KHD to the issuance of the German patent for the Schonert process.

Fuller urges that these three matters are material in the sense "that a reasonable examiner would consider them important in deciding whether to allow the application to issue as a patent." This is the definition of materiality set forth in PTO Rule 1.56(a), 37 C.F.R. § 1.56(a) (1983). These three areas of alleged deception are material in this sense only to a marginal extent. I have held that *Taggart* does not teach the '287 process and that the '287 process runs contra to accepted teaching in mineral technology. The Russian patent has limited commercial application and the contention that Schonert mischaracterized it is as marginal as his failure to disclose *Taggart*. The opposition proceedings of KHD to the German application were based primarily on *Taggart* and involve a procedure vastly different from patent litigation in the United States. However, I find that the German opposition proceedings were material in the sense expressed by PTO Rule 1.56(a).

Therefore, there is bare materiality in regard to *Taggart* and other prior art and bare materiality in regard to the Russian patent. There is a low level materiality in regard to the German opposition proceedings.

Balancing these limited levels of materiality with little or no evidence of intentional or grossly negligent conduct on the part of Schonert [8] I find that on balance Fuller has not clearly proved intentional or grossly negligent inequitable conduct on the part of Schonert or his representatives.

e. *Schonert has established that the attacks on the '287 patent should be rejected.*

The '287 patent is presumed valid. *Ralston Purina Co. v. Far–Mar–Co., Inc.*, 772 F.2d 1570 (Fed.Cir.1985). Although Fuller has made a multi-faceted attack on this patent, it has failed to overcome the presumption of validity. Fuller simply has not met the burden of proof in regard to its attack on the validity of the '287 patent.

### 2. *Fuller Has Infringed the '287 Patent.*

Fuller's second line of defense is that it has in no way infringed the '287 patent and, therefore, a declaration of validity would contravene *Fonar Corp. v. Johnson & Johnson*, 821 F.2d 627, 634 (Fed.Cir.1987), *cert. denied*, —— U.S. ——, 108 S.Ct. 751, 98 L.Ed.2d 764 (1988). In that case Chief Judge Markey held:

> "There being no infringement by J & J of any asserted claim, there remains no case or controversy between the parties. We need not pass on the validity or enforceability of claims 1 and 2."

The burden of proof is on the plaintiffs to establish by a preponderance of the evidence that Fuller has in fact infringed the '287 patent. *Hughes Aircraft Co. v. United States*, 717 F.2d 1351, 1361 (Fed. Cir.1983).

Fuller urges that it has not actually infringed the '287 patent because the only equipment it ever sold to utilize the process was sold to Lehigh Portland Cement Company, a subsidiary of a German concern. Lehigh Portland's parent had obtained a license for the process from Schonert. Consequently, Fuller claims that there was no actual infringement.

Polysius argues that test procedures carried out by Fuller in regard to samples from prospective customers utilizing the A–C compactor circuit are actual infringements. Polysius also maintains that the videotape, seminar, and brochures also constitute infringing acts on the part of Fuller.

According to Fuller, the minimal use of the A–C compactor circuit (it was operated for less than one hour with no commercial use of the product obtained) is either noninfringement or *de minimus* to an extent that for practical purposes infringement has not taken place.

I hold that infringement has taken place. There is no requirement that the activity of an alleged infringer be commercially profitable. The evidence establishes that Fuller

---

**8.** The only evidence of intentional deception would be an inference from Schonert's failure to disclose the German opposition. As the factfinder, I decline to make this inference.

in its A–C compactor circuit comminuted a bed of brittle material in a single pass at a pressure of at least 500kg/cm$^2$. The product created was in the form of an agglomerate which was subsequently deagglomerated. A reduction in energy was found in a majority of the tests and the results of the tests were communicated to prospective customers and were further utilized in proposals and performance guarantees. (Record 10.59 and 10.65). This conduct constitutes infringement of the '287 patent.

### 3. The Equipment Needed to Utilize the '287 Patent is Not a Staple Article of Commerce

Fuller's third line of defense is that Schonert, Polysius, and Krupp Polysius have violated antitrust laws by illegally using the '287 patent to monopolize and control the manufacture and sale of staple items of commerce. As a predicate to this contention, Fuller urges that high-pressure grinding rolls used to carry out the Schonert process are standard items of equipment which have substantial uses outside the confines of the '287 patent.

Fuller suggests that the '287 patent itself refers to conventional and well-known pieces of equipment at column 4, lines 3–8 of the patent. That reference concludes: "provided they are designed for the required extremely high compression forces." In actuality, existing equipment was not capable of carrying out the Schonert process because it was not designed to exert compressive forces at the levels required. It must be kept in mind that a division of Fuller, Traylor Manufacturing Company, manufactured roll crushing equipment. Its equipment, which was generally spring loaded, was not suitable for the Schonert process. Fuller recognized that Traylor equipment was not suitable and initially made overtures to a Japanese manufacturer to design and build appropriate equipment. The Japanese manufacturer declined, raising concern over the '287 patent.

Fuller then embarked on extensive research and development efforts of its own to design adequate machinery. The Fuller documents reveal its design engineers thought that the use of a computer-aided design program would be of little help since Fuller was starting "with a concept and a blank sheet of paper." See plaintiffs' exhibit no. 129.

On the other hand, Krupp Polysius spent millions of dollars in developing a high pressure roll press which it markets under the name "Polycom." Krupp Polysius was unable to utilize its existing equipment for the Schonert process and developed the Polycom especially for the '287 patent. Like Krupp Polysius, Fuller developed the Fuller HRC (high pressure roll crusher) for the precise purpose of marketing it to carry out the Schonert process.

Neither the Polycom nor the Fuller HRC are suitable for purposes other than the Schonert process because the cost of this equipment is prohibitive unless it is used for that process. There is no evidence that Fuller, Polysius, or Krupp Polysius has ever marketed the machinery for purposes other than the Schonert process. Fuller maintains that the foregoing statement is not accurate because Krupp Polysius has sold Polycom machinery to a diamond operation in South Africa where the purpose of the operation is to remove the material surrounding the diamonds. This operation appears to be a reverse application of the Schonert process. It in no way makes the Polycom equipment a staple article of commerce.

35 U.S.C. § 271(c) provides:

"Whoever sells a component of a patented machine, manufacture, combination or composition, or a material or apparatus for use in practicing a patented process, constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in an infringement of such patent, and not a staple article or commodity of commerce suitable for substantial non-infringing use, shall be liable as a contributory infringer."

35 U.S.C. § 271(d) provides:

"No patent owner otherwise entitled to relief for infringement or contributory infringement of a patent shall be denied relief or deemed guilty of misuse or illegal extension of the patent right by

reason of his having done one or more of the following: (1) derived revenue from acts which if performed by another without his consent would constitute contributory infringement of the patent; (2) licensed or authorized another to perform acts which if performed without his consent would constitute contributory infringement of the patent; (3) sought to enforce his patent rights against infringement or contributory infringement."

Congress has mandated, therefore, that if the Polycom and the Fuller HRC are non-staple articles of commerce, then plaintiffs cannot be guilty of either antitrust violations or patent misuse by controlling the sale of equipment used in conjunction with the patented process.

The distinction between a "non-staple" or a "staple" article of commerce is not always clear and precise. A non-staple article is one which was designed to carry out the patented process and has little or no utility outside of the patented process. A staple article of commerce is one that was not specifically designed for use with a patented process and has substantial, efficient, and feasible uses outside of the patent. Although the line may be hard to draw in some cases, it is clear in this case that the Fuller HRC and the Polycom are non-staple articles. Both were designed, after considerable effort and expense, to carry out the Schonert process. Both have little or no use outside of the '287 patent. Fuller has presented no evidence that there are other economically feasible uses for its Fuller HRC.

Fuller relies heavily on the testimony of Dr. Pietsch who is employed by a competitor known as Kopern Equipment, Inc., of Charlotte, North Carolina. This firm is a marketing subsidiary of a West German firm known as Kopern. Dr. Pietsch testified that his firm, prior to the issue of the '287 patent, made roll press equipment used to briquette and compact material. He testified that these roll presses, that had been used for briquetting and compaction, are "similar" to the equipment Kopern now manufactures for high pressure comminution. Consequently, Fuller urges that the high-pressure roll presses used to carry out the Schonert process are actually staple articles of commerce.

Plaintiffs' counsel, however, in a thorough cross-examination of Dr. Pietsch, brought out that Kopern's August, 1987, catalogue, defendant's exhibit no. 54, the first Kopern catalogue dealing with high-pressure comminution with roll presses, contained the following statement:

"In 1986 high-pressure roller presses for comminution were added to our manufacturing programm [sic]. The process and design parameters are being developed in our test facility."

Obviously, since high-pressure roll presses were first added to Kopern's manufacturing program in 1986 and since Kopern was still working on the process and design in April of 1987, Dr. Pietsch was less than candid in maintaining that the equipment his firm previously manufactured for compaction and briquetting purposes was similar to the high-pressure roll press needed to carry out the '287 patent. The Polycom and the Fuller HRC are non-staple articles of commerce.

### 4. *No Injunctive Relief is Necessary*

It must be kept in mind that Fuller has not sold any equipment to utilize the Schonert process except to Lehigh Portland Cement which is a licensed user of the Schonert process. Nevertheless, plaintiffs seek injunctive relief prohibiting Fuller from marketing the Fuller HRC unless the vendee of the equipment has a license to use the '287 patent. The plaintiffs maintain that Fuller has demonstrated an inclination to sell its Fuller HRC and subsequently litigate the issues of infringement and contributory infringement. Therefore, according to the plaintiffs, an injunction is necessary to protect its patent rights and to avoid unnecessary and repetitive litigation.

However, Fuller to date has not been successful, except as to Lehigh Portland, in selling a single HRC either to a firm wishing to carry out the Schonert process or for any other purpose. Consequently, in light

of the declaration that the '287 patent is valid, there seems to be no need for injunctive relief.

There is another reason why injunctive relief is not appropriate in this case. Krupp Polysius has entered into an agreement with KHD, a competitor of Krupp Polysius and Fuller, whereby Krupp Polysius will sub-license KHD and Schonert will not license any other firm unless both Krupp Polysius and KHD concur. There is authority for the proposition that agreements among some competitors not to allow further licenses for other competitors are undesirable and should not be encouraged. *See United States v. Besser Mfg. Co.*, 96 F.Supp. 304 (E.D.Mich.1951), *aff'd* 343 U.S. 444, 72 S.Ct. 838, 96 L.Ed. 1063 (1952); *Mannington Mills, Inc. v. Congoleum Industries*, 610 F.2d 1059, 1072 (3d Cir.1979); *United States v. Krasnov*, 143 F.Supp. 184 (E.D.Pa.1956), *aff'd mem.*, 355 U.S. 5, 78 S.Ct. 34, 2 L.Ed.2d 21 (1957).

I recognize that denial of injunctive relief may relegate plaintiffs to a damage action for each act of infringement committed in the future by Fuller. However, I am not at all sure that Fuller will embark on a course of infringement in light of the declaration of the validity of the '287 patent set forth in this opinion. If Fuller does not infringe the patent in the future, then there is no need for equitable relief. If Fuller does infringe the patent in the future, and if the validity of the patent is upheld on appeal, then plaintiffs can return to this court with an action seeking both damages and equitable relief. That subsequent action should be marked as related to this case in accordance with Local Rule of Civil Procedure 3 and at that time I can reconsider the issue of whether equitable relief should be denied because of the existence of an agreement among competitors to veto further licensing of the '287 patent.

### 5. *Plaintiffs Are Not Entitled to Counsel Fees for Willful Infringement*

■ Plaintiffs claim that they are entitled to reasonable attorney's fees as the prevailing party in accordance with 35 U.S.

C. § 285. The statute requires that a case be "exceptional" as a predicate to a fee award. Case law requires that the "exceptional" element be established by clear and convincing evidence.[9] Plaintiffs urge that this case is "exceptional" for several reasons. First, Fuller engaged in reprehensible conduct in sending an employee to meet with Schonert in West Germany for the purpose of appropriating Schonert's intellectual property. Second, plaintiffs urge that Fuller blatantly copied the '287 patent when it was refused a license. Third, plaintiffs maintain that Fuller proceeded with infringement prior to obtaining an opinion letter from outside counsel. Fourth, plaintiffs contend that Fuller engaged in a cover-up (erasure of the audio portion of a commercial videotape related to the patent) and caused plaintiffs considerable expense in this litigation by raising every conceivable objection to the validity of the patent and plaintiffs' claim of infringement.

There is considerable merit to plaintiffs' position. Schonert, the scholar, willingly shared his intellectual achievements with Fuller's representative. The opinion letter postdated some of the infringing acts, the copying was blatant, and Fuller's defenses were expensive to counter. Nevertheless, I find that there are several facts which suggest that this is not an exceptional case for the award of attorney's fees.

Although the letter opinion, plaintiffs' exhibit no. 46, postdates some infringing conduct, it is nevertheless an indicia of good faith. Furthermore, although Fuller raised some insubstantial defenses, several of its contentions raised legitimate and close questions. These legitimate and close questions include the troublesome issue of the failure to reveal the German opposition proceedings to the United States patent examiner and the uncertainty of the range of fineness for the product produced by the patented process.

There are several other reasons why this is not an exceptional case. Fuller made no infringing sales. No money damages are

**9.** *See Reactive Metals & Alloys Corp. v. ESM, Inc.*, 769 F.2d 1578, 1582 (Fed.Cir.1985).

sought by the plaintiffs. Although this factor does not prevent an award of attorney's fees, it is highly relevant on the issue of whether this is an exceptional case.

Finally, there is an element of discretion in whether or not an award of counsel fees is to be made.[10] Balancing the above factors, I exercise my discretion not to award counsel fees.

### 6. *Defendant's Antitrust Claims and Unfair Competition Claims are Rejected*

■ Fuller has filed counterclaims against Polysius and Schonert and has also named Krupp Polysius as a defendant on the counterclaims. Krupp Polysius defends, initially, on the ground that this court lacks *in personam* jurisdiction as far as it is concerned. I hold that the marketing in Pennsylvania of heavy industrial equipment manufactured by Krupp Polysius through its wholly owned and totally controlled subsidiary, Polysius, subjects Krupp Polysius to *in personam* jurisdiction in this forum. *PPS, Inc. v. Jewelry Sales Representatives*, 392 F.Supp. 375 (S.D.N.Y.1975).

■ My holding that the Polycom manufactured by Krupp Polysius is a non-staple article of commerce is dispositive of Fuller's counterclaim based on allegations of an illegal tying arrangement. *Dawson Chemical Co. v. Rohm & Haas Co.*, 448 U.S. 176, 201, 100 S.Ct. 2601, 2615, 65 L.Ed. 2d 696 (1980). Fuller alleges that the plaintiffs have illegally tied the '287 patent to the purchase of a Polycom. However, Congress permits a patentee to do precisely that, provided the tied product is non-staple.

Fuller also maintains that the plaintiffs have committed antitrust violations by taking aggressive steps to enforce the '287 patent when in fact the '287 patent was procured by fraud. Since I have found that Fuller has failed to prove by clear and convincing evidence that the '287 patent was procured by fraud, this antitrust claim cannot stand. Also, the decision I have made in holding that the Krupp Polysius

Polycom is a non-staple article of commerce disposes of Fuller's counterclaim that the '287 patent has been misused by the plaintiff in an attempt to control the commerce of unpatented staple articles of commerce.

What is left of the Fuller counterclaims is related to the licensing agreements for the '287 patent. In 1978 Schonert gave a non-exclusive license to Krupp Polysius. KHD was engaged in opposing the grant of a West German patent to Schonert. These opposition proceedings extended over several years. Krupp Polysius resolved this problem by amending its license agreement with Schonert to provide that Krupp Polysius be given the right to sublicense KHD provided KHD withdraws its opposition in the German patent proceedings and takes no action against foreign patent rights. Schonert further agreed that he would not grant any further licenses without the concurrence of Krupp Polysius. Krupp Polysius entered into an agreement with KHD licensing KHD to use the Schonert process and KHD withdrew its opposition to the issuance of a German patent. Krupp Polysius agreed not to grant additional sub-licenses without the consent of KHD. Krupp Polysius also agreed not to allow Schonert to grant further licenses unless KHD approved in advance. Krupp Polysius and KHD agreed to share those expenses related to the enforcement of the patents for the Schonert process. Schonert agreed that his royalties would be limited to the sale of the high-pressure presses.

■ Fuller contends that these agreements among competitors not to license others unless both agree is a *per se* violation of the Sherman Act, 15 U.S.C. § 1. I hold that this type of licensing agreement is not a *per se* violation. There is no evidence of any illegal agreement between Krupp Polysius and KHD to fix prices, allocate markets, or engage in predatory pricing. The mere fact that two competitors enter into a contractual arrangement to share (to the exclusion of others) the rights derived from a patent as well as

---

**10.** *See Machinery Corp. of America v. Gullfiber* *AB,* 774 F.2d 467, 471 (1985).

expenses connected thereto is insufficient to trigger *per se* liability. *Moraine Products v. ICI America, Inc.*, 538 F.2d 134 (7th Cir.), *cert. denied*, 429 U.S. 941, 97 S.Ct. 357, 50 L.Ed.2d 310 (1976).

 I also hold that this licensing arrangement, in the factual context of this controversy, is not a violation of either section 1 or section 2 of the Sherman Act. There are many serious and fatal problems with Fuller's antitrust counterclaims.[11] It must be emphasized that Fuller premises the alleged antitrust taint on the inclusion of a worldwide competitor (KHD) in the arrangement between Schonert and Krupp Polysius. The proof is, however, that Krupp Polysius, acting alone, made the decision not to allow Schonert to license Fuller. Fuller acknowledges as much on page 7 of its brief on this issue:

> This veto power has been exercised by Krupp Polysius. In June, 1985 on the advice of counsel that Fuller was entitled to a license, defendant Fuller requested a license from the patentee, Schonert (PX–201.3, Tr. 1.150). Schonert informed Krupp Polysius of this request (DX–363) and a member of the Board of Krupp Polysius told Dr. Schonert that it was not willing to grant a license and therefore Schonert was forced to deny Fuller's request (PX–45, Tr. 1.151 and Schonert Depo. pp. 901–07.) Schonert informed Fuller of this decision (DX–364). Executives of Krupp Polysius confirm that they were not willing to grant licenses to Fuller (Ritzmann Depo. (Vol. I) pp. 61, 65–72 and DX 225 A and B). The inventor himself testified that no matter what recommendation he made on licensing, Polysius could say no and there wasn't anything he could do about it (Tr. 15.61). In fact Krupp Polysius always did say no.

There is no antitrust prohibition against Schonert, the inventor, and Krupp Polysius, the manufacturer, combining to maximize the value of the patent. Statutory[12] pronouncements foster the policy of providing economic incentive to the innovator. Of course, the inventor and the manufacturer may not use the legal monopoly of a patent in an illegal manner whereby competitors agree upon prices, allocate markets, or unreasonably extend monopoly power. As noted, there is insufficient evidence that the plaintiffs acted illegally in these respects. It is this failure of proof that distinguishes this case from *Krasnov* and *Besser*. In those cases the defendants used the restricted licensing arrangements as a means to stifle competition and control markets. What is missing in this record is proof of illegal conduct by Krupp Polysius and/or KHD. Actually, the record shows KHD and Polysius actively competed with each other for orders.

## C. CONCLUSIONS OF LAW

1. This court has subject matter jurisdiction over the controversy before it.

2. This court has *in personam* jurisdiction over all parties to this proceeding.

3. Proper venue lies in this court.

4. The '287 patent is valid.

5. The Polycom, manufactured by Krupp Polysius, is a non-staple article of commerce.

6. There is no need for injunctive relief.

7. The plaintiffs are not entitled to an award of counsel fees.

8. All of defendant's claims based upon alleged violations of the antitrust laws of the United States are denied.

9. All of defendant's claims related to allegations of misuse of the '287 patent are denied.

10. An appropriate order will be entered.

---

**11.** These problems include but are not limited to failure to establish by a preponderance of the evidence: (1) conspiratorial intent to harm Fuller or other competitors; (2) monopoly power; (3) relevant product market; (4) relevant geographic market; (5) intent to monopolize; (6) probability of success; and (7) injury to competition.

**12.** 35 U.S.C. § 271(d).