## IN RE INDEPENDENT SERVICE ORGANIZATIONS ANTITRUST LITIGATION.

Civil Action No. MDL–1021.

United States District Court, D. Kansas.

Dec. 22, 1997.

P. John Owen, Morrison & Hecker L.L.P., Kansas City, MO, Eric D. Braverman, Employers Reinsurance Corporation, Overland Park, KS, Lori R. Schultz, Morrison & Hecker L.L.P., Kansas City, MO, for CSU, L.L.C.

Peter K. Bleakley, Arnold & Porter, Washington, DC, Peter W. Marshall, Xerox Corporation, Stamford, CT, Michael G. Norris, Norris, Keplinger & Logan, L.L.C., Overland Park, KS, C. Larry O'Rourke, E. Robert Yoches, Vincent P. Kovalick, Leslie I. Bookoff, Finnegan, Henderson, Farabow, Garrett & Dunner, Washington, DC, for Xerox Corporation.

### MEMORANDUM AND ORDER

EARL E. O'CONNOR, Senior District Judge.

This matter is before the court on the motion of CSU, L.L.C. ("CSU") for reconsideration of the court's April 8 and July 17, 1997 Orders (Doc. # 664) and the motion of Xerox Corporation ("Xerox") for reconsideration of the court's March 19 and 21, 1997 Orders (Doc. # 666). Both parties' motions concern the legal issue of whether Xerox's unilateral refusal to license or sell its patented and copyrighted products may constitute a misuse defense to an infringement claim or unlawful exclusionary conduct under the antitrust laws.

The court originally held that Xerox's refusal to deal could constitute misuse and exclusionary conduct. *See* Mar. 19 Mem. & Order at 7–16, 22; Mar. 21 Mem. & Order at 18–19. Xerox requested and the court granted reconsideration of this ruling with respect to Xerox's patented products. On reconsideration, the court held that Xerox's unilateral refusal to sell or license its patented products cannot constitute patent misuse or unlawful

exclusionary conduct under the antitrust laws. *See* Apr. 8 Mem. & Order at 16–22. CSU requested reconsideration or, in the alternative, certification of the court's April 8 order. On July 17, the court denied CSU's motion for reconsideration, but granted CSU's request to certify the April 8 order for interlocutory appeal. *See* July 17 Mem. & Order at 2–6. On September 8, the Federal Circuit declined to hear the appeal. *See CSU Holdings, Inc. v. Xerox Corp.*, 129 F.3d 132, 1997 WL 632785 (Fed.Cir.1997). CSU now requests reconsideration of the court's ruling with respect to patents, while Xerox requests that the court extend its ruling on patents to the area of copyrights. After careful consideration of the parties' briefs and the authorities cited therein, the court will deny CSU's motion for reconsideration and grant Xerox's motion.

### Factual Background

The factual background of this matter has been set forth in the court's previous orders. The following is a brief summary.

In 1984, Xerox developed its first "parts policy," in which it declared it would not sell "parts which are unique to the '10' Series products in memory writers" to any Independent Service Organization ("ISO") unless the ISO also was an end-user of the product. In January 1987, the parts policy was expanded to apply to newer "9" Series models and all "10" Series copiers, plus all new Xerox products introduced after the effective date of the policy.

In January 1989, Xerox tightened enforcement of its existing parts policies and cut off CSU's direct purchase of restricted parts from Xerox. Xerox also implemented an "on-site end-user verification" procedure when certain ISOs or their customers ordered parts from Xerox. The policy, which was implemented in June 1989, initially applied solely to the six most successful ISOs, including CSU.

As a result of Xerox's parts policies, CSU claims that it did not have an assured source of supply of parts necessary to service Xerox copiers and printers. CSU argues that it abandoned its expansion plans as a result of Xerox's parts policies. To maintain its existing business, CSU used parts cannibalized from used Xerox equipment, parts obtained from other ISOs, and parts purchased through a limited number of customers. CSU also obtained parts from Rank Xerox, a majority-owned European affiliate of Xerox, for approximately one year, until Xerox forced Rank Xerox to stop selling parts to CSU and other ISOs.

In 1994, Xerox settled an antitrust lawsuit brought by a class of ISOs in the United States District Court for the Eastern District of Texas (the "*R&D* Litigation"). CSU opted out of the *R&D* settlement on the same day it filed the instant action against Xerox. Pursuant to the *R&D* settlement, Xerox agreed to suspend its restrictive parts policy for a period of six and one-half years. The settlement also compelled Xerox to license diagnostic software, an essential component for service, for four and one-half years.

After the *R&D* settlement, CSU claims that Xerox intensified its efforts to use price as a weapon to defeat ISO competition in the service market. CSU alleges that Xerox intentionally set the prices of its patented parts at high levels to act as a weapon against ISOs and to maintain Xerox's monopoly of the service market. Xerox charges ISOs significant markups on its parts. Xerox does not charge its customers who also service their own machines ("self-servicers") the same parts prices it charges ISOs. CSU argues that Xerox explicitly set the price of its patented parts, not to recoup its development costs, but to force ISOs to raise the prices they charge customers. CSU maintains that Xerox's goal of its pricing strategy was to eliminate ISO competition and capture 100% of the service market.

CSU alleges in its complaint that Xerox violated the Sherman Act by seeking to eliminate ISOs generally and CSU particularly as competitors in the relevant service markets for high speed copiers and printers. CSU alleges that Xerox has engaged in abusive, exclusionary, and predatory conduct, by seeking to preempt business opportunities, refusing to deal with ISOs, denying essential facilities to ISOs or only providing them on unreasonable terms, and seeking to leverage

its monopoly power in the relevant high volume equipment and parts markets to acquire and/or maintain monopoly power in the relevant service markets.

Xerox has asserted several defenses for its conduct. In the instant motions, Xerox contends that CSU has not suffered antitrust injury, because its alleged injury is attributable to Xerox's lawful refusal to sell patented parts and copyrighted software. Xerox also claims that CSU cannot assert a patent or copyright misuse defense to Xerox's infringement counterclaims based on Xerox's refusal to deal.

### Analysis

To establish monopolization under section 2 of the Sherman Act, CSU must prove that (1) Xerox possessed monopoly power in the relevant market and (2) Xerox willfully acquired or maintained that monopoly power "as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 480, 112 S.Ct. 2072, 2080, 119 L.Ed.2d 265 (1992) (quoting *United States v. Grinnell Corp.*, 384 U.S. 563, 570–71, 86 S.Ct. 1698, 1703–04, 16 L.Ed.2d 778 (1966)). In the instant motions, Xerox does not contest that it has monopoly power in the relevant parts and service markets. The disputed issues arise over whether Xerox's refusal to sell its patented and copyrighted products satisfies the conduct element of a section 2 claim.[1]

CSU's primary basis for requesting reconsideration of our prior rulings and denial of Xerox's motion for reconsideration is the Ninth Circuit's recent decision in *Image Tech. Servs., Inc. v. Eastman Kodak Co.* ("*Kodak*"), 125 F.3d 1195 (9th Cir.1997). In *Kodak*, the court held that " 'while exclusionary conduct can include a monopolist's unilateral refusal to license a [patent or] copy-

right,' or to sell its patented or copyrighted work, a monopolist's 'desire to exclude others from its [protected] work is a presumptively valid business justification for any immediate harm to consumers.' " *Id.* at 1218 (quoting *Data General Corp. v. Grumman Sys. Support Corp.*, 36 F.3d 1147, 1187 (1st Cir.1994)). The court explained that "Kodak may assert that its desire to profit from its intellectual property rights justifies its conduct, and the jury should presume that this justification is legitimately procompetitive." 125 F.3d at 1219. Nevertheless, the Ninth Circuit held that the presumption afforded copyright and patent holders can be rebutted by evidence that the intellectual property holder's refusal to deal was not truly based on a desire to protect its intellectual property rights. *Id.* As explained in detail below, we decline to follow the Ninth Circuit's holding in *Kodak*. Rather, we find that where a patent or copyright has been lawfully acquired, subsequent conduct permissible under the patent or copyright laws cannot give rise to any liability under the antitrust laws. *See Miller Instituform, Inc. v. Instituform of North Am., Inc.*, 830 F.2d 606, 609 (6th Cir.1987), *cert. denied*, 484 U.S. 1064, 108 S.Ct. 1023, 98 L.Ed.2d 988 (1988); *United States v. Westinghouse Elec. Corp.*, 648 F.2d 642, 647 (9th Cir.1981); *SCM Corp. v. Xerox Corp.*, 645 F.2d 1195, 1206 (2d Cir.1981), *cert. denied*, 455 U.S. 1016, 102 S.Ct. 1708, 72 L.Ed.2d 132 (1982); *see also Data General*, 36 F.3d at 1185–87 (noting that a monopolist's unilateral refusal to license a patent is not exclusionary conduct while holding that a monopolist's unilateral refusal to license a copyright may be exclusionary conduct "in rare cases"— apparently only when the copyright has been acquired in an unlawful manner).

### I. A Single Patent Can Implicate Multiple Antitrust Markets.

We begin with a discussion of the distinction between a "patent monopoly" and

---

**1.** If CSU can establish an antitrust violation with respect to Xerox's refusal to license its copyrights, the same evidence likely will establish copyright misuse, which is CSU's primary defense to Xerox's copyright infringement counterclaim. *See* Mar. 21 Mem. & Order at 17–18 (citing *Lasercomb, Am., Inc. v. Reynolds*, 911 F.2d 970, 978 (4th Cir.1990)). On the other hand, CSU's patent misuse defense is premised

on Xerox's pricing of its patented products after April 1994, when Xerox started selling patented parts to CSU. We held previously that Xerox could price its patented parts as high as it sees fit. *See* Apr. 8 Mem. & Order at 24. Based on the Ninth Circuit's ruling in *Kodak* that a patent monopolist may charge a monopoly price for its products, CSU has not requested reconsideration of our previous ruling.

an "economic monopoly." *See American Hoist & Derrick Co. v. Sowa & Sons, Inc.,* 725 F.2d 1350, 1367 (Fed.Cir.) ("The patent system, which antedated the Sherman Act by a century, is not an 'exception' to the antitrust laws, and patent rights are not legal monopolies in the antitrust sense of that word."), *cert. denied,* 469 U.S. 821, 105 S.Ct. 95, 83 L.Ed.2d. 41 (1984); *Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.,* 575 F.2d 1152, 1160 n. 8 (6th Cir.1978) ("The loose application of the pejorative term 'monopoly,' to the property right of exclusion represented by a patent, can be misleading. Unchecked it can destroy the constitutional and statutory scheme reflected in the patent system."). The scope of a "patent monopoly" is defined by the claims of the patent, not by the limits of what a court determines is the most analogous antitrust market. *See Dawson Chem. Co. v. Rohm & Haas Co.,* 448 U.S. 176, 221, 100 S.Ct. 2601, 2625–26, 65 L.Ed.2d 696 (1980) ("[T]he boundary of a patent monopoly is to be limited by the literal scope of the patent claims."); *Motion Picture Patents Co. v. Universal Film Mfg. Co.,* 243 U.S. 502, 510, 37 S.Ct. 416, 418, 61 L.Ed. 871 (1917) ("The patent law simply protects [the patent holder] in the monopoly of that which he has invented and has described in the claims of his patent."); *see also Kodak,* 125 F.3d at 1216–17 ("The relevant market for determining the patent or copyright grant is determined under patent or copyright law."). On the other hand, an "economic monopoly," as we have used the term, refers to a firm's power to control the price of a product in a properly defined relevant antitrust market.

We believe that the Ninth Circuit in *Kodak,* in reaching its conclusion, implicitly assumed that a single patent can create at most a single "inherent" economic monopoly. 125 F.3d at 1215–16. The Supreme Court in *Kodak* certainly did not reach this issue. In *Kodak,* the Supreme Court stated that it "has held many times that power gained through some natural and legal advantage such as a patent, copyright, or business acumen can give rise to [antitrust] liability if 'a seller exploits his dominant position in one market to expand his empire into the next [market].'" *Kodak,* 504 U.S. at 479 n. 29, 112 S.Ct. at 2089 n. 29 (quoting *Times–Picayune*

*Publ'g Co. v. United States,* 345 U.S. 594, 611, 73 S.Ct. 872, 881–82, 97 L.Ed. 1277 (1953)). The Court's statement simply is not applicable where a patent holder, exercising his unilateral right to refuse to license or use his invention, acquires a monopoly in two separate relevant antitrust markets. There is no unlawful leveraging of monopoly power when a patent holder merely exercises its rights inherent in the patent grant. In other words, to the extent Xerox gained its monopoly power in any market by unilaterally refusing to license its patents, such conduct is permissible under the antitrust laws. Xerox's legal right to exclude ISOs in the service markets from using Xerox's patented inventions arose from its patents, not from an unlawful leveraging of its monopoly power in the parts market.

▪ The patent statute illustrates that a patent holder's unilateral refusal to deal cannot constitute unlawful leveraging of monopoly power. The Patent Reform Act of 1988 added subsection 271(d)(4), which provides:

> No patent owner otherwise entitled to relief for infringement or contributory infringement shall be denied relief or deemed guilty of misuse *or illegal extension of the patent right* by reason of having ... refused to license or use any rights to the patent.

35 U.S.C. § 271(d)(4) (emphasis added). The Ninth Circuit in *Kodak* and CSU maintain that this statutory provision only bars a misuse defense to an infringement claim but does not preclude antitrust claims premised on a unilateral refusal to license a patented work. 125 F.3d at 1214 n. 7. Such an interpretation is contrary to the statutory language and legislative history of the amendment. First, the statutory language "illegal extension of the patent right" is an alternative to "deemed guilty of misuse." The statutory provision would be redundant if "illegal extension of the patent right" applied only to misuse defenses. Accordingly, we believe that section 271(d)(4) should be interpreted to apply to antitrust claims. The language "illegal extension of the patent right" closely tracks the antitrust law prohibition against an unlawful extension of market power be-

yond the limits of the patent monopoly. *See generally Atari Games Corp. v. Nintendo of Am., Inc.,* 897 F.2d 1572, 1576 (Fed.Cir. 1990). Moreover, the legislative history also supports the conclusion that section 271(d)(4) applies to antitrust claims. Representative Kastenmeier stated that "codification of the 'refusal to use or license' as not constituting patent misuse is consistent with the current caselaw and makes sense as a matter of public policy." 134 Cong.Rec. H10646, H10648 (Oct. 20, 1988). Representative Kastenmeier first cited *SCM,* 645 F.2d at 1203–06, and then *Continental Paper Bag Co. v. Eastern Paper Bag, Co.,* 210 U.S. 405, 426–30, 28 S.Ct. 748, 754–56, 52 L.Ed. 1122 (1908), in the legislative history as support for the amendment. The *SCM* case involved only an antitrust claim. Why would Representative Kastenmeier cite an antitrust case as the primary authority for a statutory provision Congress intended to limit only to patent misuse claims? Finally, the court notes that section 271 of the patent statute would be virtually meaningless to many patent holders if it did not also apply to antitrust claims. It makes little sense to preclude an infringer from asserting a misuse defense based on a patent holder's refusal to deal while simultaneously allowing the infringer to recover treble damages under the antitrust laws for the very same conduct. *See Rohm & Haas Co. v. Dawson Chem. Co.,* 557 F.Supp. 739, 835 (S.D.Tex.) ("it would be superfluous to sanction and protect activity within one area of the law and concurrently prohibit and expose a patentee to damages by reason of another body of law"), *rev'd on other grounds,* 722 F.2d 1556 (Fed.Cir.1983). Several courts have applied section 271 to both antitrust and patent misuse defense claims. *See, e.g., Polysius Corp. v. Fuller Co.,* 709 F.Supp. 560, 575 (E.D.Pa.) (pursuant to section 271, "Congress has mandated ... [that] plaintiffs cannot be guilty of either antitrust violations or patent misuse"), *aff'd,* 889 F.2d 1100 (Fed.Cir.1989); *see also Data General,* 36 F.3d at 1187 (noting that section 271 "may even herald the prohibition of all antitrust claims and counterclaims premised on a refusal to license a patent.").

The Ninth Circuit in *Kodak* and CSU assume, without discussion, that a single patent (or "patent monopoly") can be equated with a single relevant antitrust market. Although most patented inventions likely will be marketed in a single antitrust market, some inventions may be useful in multiple markets. The Ninth Circuit's holding would discourage the invention of such products. Inventors rarely could refuse to license their products without fear that they had not properly defined the relevant antitrust market or considered how the relevant markets may be defined in the future. *See* Apr. 8 Mem. & Order at 18–19; *SCM,* 645 F.2d at 1206 ("If the threat of treble damage liability for refusing to license were imbedded in the minds of potential patent holders as a likely prospect incident to every successful commercial exploitation of a patented invention, the efficacy of the economic incentives afforded by our patent system might be severely diminished.").

We believe that a patent holder can lawfully acquire more than one "inherent" or "economic" monopoly by exercising the exclusionary power of a single patent. The court is not aware of any patent which states that it confers a monopoly in a particular antitrust market. Patents only claim inventions. Because each use of that invention may be prevented by the patent holder, the patent may have some anticompetitive effect in each market in which it is used or not used. *See* Apr. 8 Mem. & Order at 20 n. 5. The patent statute expressly grants patent holders the right to exclude others from manufacturing, selling, or using their inventions. *See* 35 U.S.C. § 154 ("Every patent shall contain ... a grant to the patentee, his heirs or assigns, for the term of seventeen years ... the right to exclude others from making, using, or selling the invention"); *see also* 35 U.S.C. § 271(d) (no patent holder shall be deemed guilty of misuse or illegal extension of the patent right by refusing to license or use any rights to the patent). Manufacturing, retail, and service markets all fall within this statutory grant of power to patent holders. Thus, Congress, by enacting the patent statute, apparently contemplated that a single patent could implicate more than one market. Courts also have allowed patent holders to exercise the exclusive power of a

patent in multiple markets. *See Miller Insituform*, 830 F.2d at 609 (finding that a charge of "vertical integration" is inapplicable to a patent monopolist because "[t]here is no adverse effect on competition since, as a patent monopolist, INA, from the start, had exclusive right to manufacture, use, and sell his invention"); *Servicetrends, Inc. v. Siemens Medical Systems, Inc.*, 870 F.Supp. 1042, 1056 (N.D.Ga.1994) ("Although the Court need not decide the issue here, it appears that defendant is entitled to a so-called monopoly in the repair of its shocktube replacement part—a monopoly power that is inherent in its right to sell or refuse to sell the patented components."), *amended on reconsideration*, 1994 WL 776878 (N.D.Ga. Jun.24, 1994) (finding as a factual matter that the individual component parts of the shocktube were not patented).

CSU argues that the Ninth Circuit's decision in *Kodak* is supported by a number of cases that have held that patent holders are not immune from the antitrust laws. *See Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969); *United States v. Line Material Co.*, 333 U.S. 287, 68 S.Ct. 550, 92 L.Ed. 701 (1948); *Atari, supra,*. These authorities state the well-established law that a patent holder cannot use its patent to extend its power beyond the limits of the patent monopoly. *See Zenith*, 395 U.S. at 136, 89 S.Ct. at 1583 ("[T]here are *established limits which the patentee must not exceed* in employing the leverage of his patent to control or limit the operations of the licensee.") (emphasis added); *Line Material*, 333 U.S. at 308, 68 S.Ct. at 561 ("Possession of a valid patent or patents does not give the patentee any exemption from the provisions of the Sherman Act *beyond the limits of the patent monopoly*.") (emphasis added); *Atari*, 897 F.2d at 1576 ("On the other hand, a patent owner may not take the property right granted by a patent and use it to extend his power in the marketplace improperly, *i.e., beyond the limits of what Congress intended to give in the patent laws*.") (emphasis added). Notably, none of the authorities cited by CSU, with the exception of *Kodak*, support the proposition that a patent holder's unilateral refusal to deal may constitute an unlawful extension of the patent monopoly or unlawful exclusionary conduct under the antitrust laws. A patent holder's right to exclude others from practicing an invention surely is within the limits of the patent monopoly as Congress specifically authorizes such conduct in the patent statute. *See* 35 U.S.C. § 154 (right to exclude others); 35 U.S.C. § 271(d) (no misuse or unlawful extension of monopoly for refusal to deal); *see also Zenith*, 395 U.S. at 135, 89 S.Ct. at 1583 ("The heart of [the patent holder's] legal monopoly is the right to invoke the State's power to prevent others from utilizing his discovery without his consent."). Accordingly, courts generally have not imposed antitrust liability on patent holders for conduct that is permissible under the patent laws. *See Miller Insituform*, 830 F.2d at 609; *Westinghouse*, 648 F.2d at 647; *SCM*, 645 F.2d at 1206; *Servicetrends*, 870 F.Supp. at 1056; *Lightwave Technologies, Inc. v. Corning Glass Works*, No. 86 Civ. 759(KC), 1991 WL 4737, at *7 (S.D.N.Y.1991); *Chisholm–Ryder Co., Inc. v. Mecca Bros., Inc.*, 217 U.S.P.Q. 1322, 1338, 1982 WL 1950 (W.D.N.Y.1982), *aff'd*, 746 F.2d 1489 (Fed. Cir.1984); *GAF Corp. v. Eastman Kodak Co.*, 519 F.Supp. 1203, 1233 (S.D.N.Y.1981); *see also* 3 Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 708d at 190 (Rev. 1996) (hereinafter "Areeda & Hovenkamp") ("And while courts have construed antitrust law to impose other constraints on patentee behavior—such as I prohibiting the use of tying arrangements and similar practices— none of those instances involved overriding an express patent law grant."). Indeed, the Ninth Circuit in *Kodak* recognized that it could "find no reported case in which a court has imposed antitrust liability for a unilateral refusal to sell or license a patent or copyright." 125 F.3d at 1216. Our April 8 and July 17 rulings regarding patents are entirely consistent with the pre–*Kodak* authorities cited by CSU because a patent holder's unilateral refusal to deal is within the express limits of the "patent monopoly." *See United States v. Telectronics Proprietary, Ltd.*, 607 F.Supp. 753, 755 (D.Colo.1983) ("Indeed, the unilateral right to license, exclusively or otherwise, or to refuse to license at all, reflects the essence of the statutory patent monopo-

ly.... Such unilateral licensing conduct does no more than employ means 'normally and reasonably adapted' to maintain the monopoly under the law.").

In essence, CSU maintains that Xerox achieved too much success—monopoly power in two antitrust markets—by exercising its rights inherent in the patent grant. With the exception of the district court and the Ninth Circuit in *Kodak*, however, courts consistently have held that a patent holder's right to exclude others from using its patented invention is not conditioned on the economic success or failure of the patent holder. *See Dawson*, 448 U.S. at 215, 100 S.Ct. at 2622–23 (the patent statute gives a patent holder the "right to exclude others from profiting by the patented invention"); *SCM*, 645 F.2d at 1206 (a patent holder can continue "to exercise his patent's exclusionary power even after achieving commercial success; to allow the imposition of treble damages based on what a reviewing court might later consider, with the benefit of hindsight, to be too much success would seriously threaten the integrity of the patent system"). The court believes that the result should be no different whether a patent holder's success, achieved by conduct expressly sanctioned by the patent statute, impacts one or more relevant antitrust markets. *See Miller Insituform*, 830 F.2d at 609.

The rationale of the patent system mandates that a patent holder's right to exclude cannot be limited by the definition of the relevant antitrust markets. "The federal patent system [ ] embodies a carefully crafted bargain for encouraging the creation and disclosure of new, useful, and nonobvious advances in technology and design in return for the exclusive right to practice the invention for a period of years." *Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*, 489 U.S. 141, 150–51, 109 S.Ct. 971, 977, 103 L.Ed.2d 118 (1989). Numerous courts have held that the patent holder's reward, his exclusive right to practice an invention, is unlimited by the law; the only limits on the patent holder's exercise of its right are created by the demand for the product which embodies the invention. *See, e.g., King Instruments Corp. v. Perego*, 65 F.3d 941, 950 (Fed.Cir.1995), *cert. denied*,

517 U.S. 1188, 116 S.Ct. 1675, 134 L.Ed.2d 778 (1996) ("Thus, the Patent Act creates an incentive for innovation. The economic rewards during the period of exclusivity are the carrot. The patent owner expends resources in expectation of receiving this reward. Upon grant of the patent, the only limitation on the size of the carrot should be the dictates of the marketplace."); *United States v. Studiengesellschaft Kohle, m.b.H.*, 670 F.2d 1122, 1129 (D.C.Cir.1981) ("The patent gives [the holder] the unlimited right to exclude others from utilizing its process."). "A valid patent gives to the public something it never had earlier. The resultant monopoly is outside of the antitrust laws and its exercise within the patent grant is not violative thereof." *Chisholm–Ryder*, 217 U.S.P.Q. at 1338; *see United States v. United Shoe Machinery Co.*, 247 U.S. 32, 57, 38 S.Ct. 473, 482, 62 L.Ed. 968 (1918) ("Of course, there is restraint in a patent. Its strength is in the restraint, the right to exclude others from the use of the invention, absolutely or on the terms the patentee chooses to impose. This strength is the compensation which the law grants for the exercise of invention. Its exertion within the field covered by the patent law is not an offense against the Anti-Trust Act."). Except for the district court and Ninth Circuit in *Kodak*, we are not aware of any court that has limited a patent holder's right to exclude others to a single relevant antitrust market. The reward for a patented invention is the right to exploit the entire field of the "invention," *not* the right to exploit the single most analogous antitrust market. *See, e.g., Chisholm–Ryder*, 217 U.S.P.Q. at 1338 ("One would have to be suffering from 'unthinking monopolophobia' to deny [a patent holder] the right, given to it as the quid pro quo—its right to exclude in exchange for its disclosure to the public of these inventions—to monopolize the field covered by its patents to the exclusion of all others."); *W.L. Gore & Assocs., Inc. v. Carlisle Corp.*, 529 F.2d 614, 623 (3d Cir.1976) ("The right to refuse to license is the essence of the patent holder's right under the patent law which rewards invention disclosure by the grant of a limited monopoly in the exploitation of the invention."); *see also King Instruments*, 65 F.3d at 950 ("This court should

not presume to determine how a patentee should maximize its reward for investing in innovation.").

In *Kodak*, the Ninth Circuit also directed that the district court modify its injunction to eliminate the requirement that Kodak must sell its patented and copyrighted products at reasonable prices. The court acknowledged that "Kodak is entitled to monopoly·prices on its patented and copyrighted parts." ₍125 F.3d at 1225. The modified injunction allows Kodak to charge "any nondiscriminatory price that the market will bear." *Id.* at 1225–26. The Ninth Circuit's treatment of the injunction is fundamentally inconsistent with its holding regarding the lawfulness of Kodak's refusal to license its intellectual property. As we have noted elsewhere, "[a] royalty demand which is so high as to preclude acceptance of a license offer is, after all, not appreciably different from a refusal to license upon any terms." *W.L. Gore*, 529 F.2d at 623; *see* 3 Areeda & Hovenkamp ¶ 708d at 189 ("[I]mposing a licensing duty would necessarily require judicial regulation of the royalty at ·which the [ ] patent would have to be licensed, for otherwise· the patentee could negate the obligation by setting a rate so high that there would be no takers"). In addition, we note that the requirement of nondiscriminatory pricing directly conflicts with the basic tenet of patent law that a patent holder has an untrammeled right to selectively license its patent. *See, e.g., Genentech, Inc. v. Eli Lilly & Co.*, 998 F.2d 931, 949 (Fed.Cir.1993), *cert. denied*, 510 U.S. 1140, 114 S.Ct. 1126, 127 L.Ed.2d 434 (1994); *Westinghouse*, 648 F.2d at 647. A patent holder's right to price its patented products at different prices to different customers is inherent in the patent grant. *See USM Corp. v. SPS Technologies, Inc.*, 694 F.2d 505, 512–13 (7th Cir.1982) ·(Posner, J.) (noting that "there is no antitrust prohibition against a patent owner's using price discrimination to maximize his income from the patent"), *cert. denied*, 462 U.S. 1107, 103 S.Ct. 2455, 77 L.Ed.2d 1334 (1983).

Finally, CSU attempts to analogize this case to *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 105 S.Ct. 2847, 86 L.Ed.2d 467 (1985). In *Aspen Skiing*, defendant owned three of four· ski locations in Aspen, Colorado. The court held that defendant had violated section 2 of the Sherman Act by refusing to continue a joint marketing arrangement with the owner of the fourth ski location in Aspen, which allowed customers to purchase a joint ticket useable at all four ski locations. The Court's holding was based on the unique facts where "competition required some cooperation among competitors" in the Aspen ski market and the joint tickets satisfied consumer demand. *Olympia Equip. Leasing Co. v. Western Union Telegraph Co.*, 797 F.2d 370, 377 (7th Cir.1986); *see Aspen Skiing*, 472 U.S. at 603, 105 S.Ct. at 2857–58. We find *Aspen Skiing* distinguishable for two reasons. First, *Aspen Skiing* did not involve intellectual property rights. The Second Circuit has soundly rejected the argument that "a unilateral refusal . to license a patent should be treated like any other refusal to deal by a monopolist." *SCM*, 645 F.2d at 1204. We agree with the Second Circuit's reasoning in *SCM* and conclude that the general law regarding refusals to deal by a monopolist cannot logically be imported to the patent and copyright areas without seriously undermining the objectives of the intellectual property laws.[2] Second, CSU has not shown that analogous facts exist in this case, *i.e.*, that competition in the service market requires some cooperation among competitors or that consumers were harmed by Xerox's policies. The First Circuit rejected an antitrust plaintiff's attempt to invoke *Aspen Skiing* based on facts similar to this case. *See· Data General*, 36 F.3d at 1188.

■ For all of the above reasons, we hold that if a patent is lawfully acquired, a patent holder's unilateral refusal to sell or license its patented invention does not constitute unlawful exclusionary conduct under the antitrust laws even if the refusal impacts competition in more than one relevant antitrust market.

2. In *Data General*, the First Circuit expressed some doubt about the applicability of *Aspen Skiing* in the area of intellectual property but assumed for purposes of the opinion that the

exclusionary withdrawal of assistance could overcome, in certain circumstances, the presumption that a refusal to license a copyright is not exclusionary. 36 F.3d at 1188.

## II. A Patent Holder's Intent In Refusing To Deal Is Irrelevant .

In *Kodak*, the Ninth Circuit held that a patent holder's refusal to deal is a presumptively valid business justification for any harm to consumers, but such a presumption may be rebutted by evidence that the patent holder's refusal to deal was not truly based on a desire to protect its intellectual property rights. 125 F.3d at 1219. The *Kodak* court relied significantly on the First Circuit's *Data General* opinion for its holding. We believe, however, the *Kodak* holding goes significantly beyond, and in some respects is contrary to, the First Circuit's reasoning in *Data General.* The Ninth Circuit did not cite any authority for its conclusion that pretext is sufficient to rebut the presumption afforded patent and copyright holders for their refusal to deal. In *Data General,* the First Circuit criticized any "search for an overriding antisocial motivation" as "unilluminating." 36 F.3d at 1189. The First Circuit affirmed the grant of summary judgment in favor of the manufacturer notwithstanding the court's assumption that the manufacturer's policy was motivated by "the goal of maximizing revenues from its service business" and by the manufacturer's desire "to maintain its monopoly in the aftermarket for service of [its] computers." 36 F.3d at 1154, 1188. In contrast, the Ninth Circuit in *Kodak* treated the district court's failure to instruct that a patent holder's refusal to deal is presumptively valid as "harmless error" and accordingly affirmed a jury verdict against Kodak.[3]

CSU argues that by accepting Xerox's position, the court would have to hold that intent is not a fundamental issue under Section 2 of the Sherman Act. Intent to monopolize certainly is an essential element of a Section 2 claim, however, proof of intent to monopolize cannot transform a patent holder's unilateral refusal to deal into unlawful exclusionary conduct. The Supreme Court has held that a patent holder's subjective motivation for excluding others from use of an invention is irrelevant. In *Continental Paper Bag,* the Court stated: "As to the suggestion that competitors were excluded from the use of the new patent, we answer that such exclusion may be said to have been of the very essence of the right conferred by the patent, as it is the privilege of any owner of property to use or not use it, *without question of motive.*" 210 U.S. at 429, 28 S.Ct. at 756 (citing *Connolly v. Union Sewer Pipe Co.,* 184 U.S. 540, 546, 22 S.Ct. 431, 434, 46 L.Ed. 679 (1902)) (emphasis added). Later, in *Hartford–Empire Co. v. United States,* 323 U.S. 386, 65 S.Ct. 373, 89 L.Ed. 322 (1945), the Court explained: "A patent owner is not in the position of a quasi-trustee for the public or under any obligation to see that the public acquires the free right to use the invention. He has no obligation either to use it or to grant its use to others." *Id.* at 432–33, 65 S.Ct. at 395–96. Courts similarly do not analyze a patent holder's subjective motivation in setting a license price. *See W.L. Gore,* 529 F.2d at 622–23 ("The [antitrust plaintiff's] speculation as to the [defendant's] motives in offering a license at what the [plaintiff] considered an exorbitant price, [ ] we regard as irrelevant.").

A patent holder's intent in exercising its exclusionary power is irrelevant because the right to exclude competitors from using an invention is expressly authorized by law. In *United States v. Rock Royal Co-op.,* 307 U.S. 533, 59 S.Ct. 993, 83 L.Ed. 1446 (1939), the Supreme Court held that a price fixing conspiracy authorized by a milk cooperative law and order of the Secretary of Agriculture did not violate the antitrust laws regardless of defendants' "ulterior motives," other acts of fraud, public misrepresentations, and threats of a group boycott. *Id.* at 556–60, 59 S.Ct. at 1005–07; *see Professional Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc.,* 508 U.S. 49, 59, 113 S.Ct. 1920, 1927–28, 123

---

3. CSU argues that we should follow the First Circuit's rationale in *Data General,* and adopt only a rebuttable presumption that Xerox's refusal to license patented and copyrighted products is lawful. Even under the First Circuit's standard, however, we would find for Xerox as a matter of law because imposing liability in this case likely would frustrate the purposes of the Patent and Copyright Acts. *See id.* at 1187 n. 64 ("we do not hold that an antitrust plaintiff can never rebut this presumption, for there may be rare cases in which imposing antitrust liability is unlikely to frustrate the objectives of the Copyright Act").

L.Ed.2d 611 (1993) ("Whether applying *Noerr* as an antitrust doctrine or invoking it in other contexts, we have repeatedly reaffirmed that evidence of anticompetitive intent or purpose alone cannot transform.otherwise legitimate activity into a sham.").

The standard articulated by the Ninth Circuit in *Kodak* makes it very difficult for a jury, a judge, or even the patent holder, to distinguish between a permissible refusal to deal (based on a desire to profit from and protect patent rights) and an impermissible refusal to deal (apparently based on a desire to obtain a competitive advantage by excluding competitors). A patent holder does not refuse to share its invention because the property is patented, rather, the refusal is based on a desire to obtain a competitive advantage. *See* 3 Areeda & Hovenkamp ¶ 705b at 156 ("[N]o commercial firm invents except with the hope of prevailing over its rivals. And no one can apply for a patent without knowingly intending to acquire the legal power to exclude—that is the entire point of the patent grant. As a result, the inventor's intent rarely or never provides a guide to determining liability."). The patent is merely the means by which its holder may obtain this competitive advantage. To classify the desire to obtain a competitive advantage over competitors as pretext is to read the right to exclude out of the patent statute. Under the *Kodak* standard, a self-serving memorandum in the files of a corporate executive, which states that the company is refusing to license its products because they are patented, apparently could be sufficient to protect the company's refusal to deal from antitrust scrutiny. On the other hand, a company would be subject to antitrust liability for having a corporate memorandum which states that the company plans to use its intellectual property rights to exclude competitors and achieve a competitive advantage in the marketplace. The monopolist's conduct, as well as the anticompetitive effect on the relevant markets, is identical in both circumstances. We decline to adopt a rule imposing antitrust liability based on such fine line distinctions of subjective intent. In es-

sence, the difference between protected and unprotected conduct under *Kodak* is based on whether the company engaged in the formalistic ritual of documenting that "our patent rights is what truly is motivating our refusal to deal." [4] For the above reasons and given that nearly all commercial research is based on mixed motivations, we conclude that a patent holder is not required to proffer a legitimate business justification to avoid antitrust liability for exercising its right to refuse to sell or license a patented invention. *See* 3 Areeda & Hovenkamp ¶ 705 at 156–57.

## III. A Patent Holder's Other Activities Are Not Relevant In Determining The Lawfulness Of Its Refusal To Deal.

We held in our previous orders that Xerox's refusal to license its patented products cannot be transformed into unlawful conduct merely because of Xerox's other alleged exclusionary acts. *See* July 17 Mem. & Order at 6. CSU argues that assuming Xerox's refusal to sell patented products is otherwise lawful, such conduct may be illegal if Xerox engaged in other unlawful exclusionary acts. CSU maintains that otherwise lawful conduct, when combined with unlawful acts pursuant to a scheme to monopolize, may violate. Section 2 of the Sherman Act. The key to our April 8 and July 17 rulings, however, is that Xerox's refusal to license is expressly authorized by patent law and therefore immune from antitrust scrutiny. This result is compelled by the holdings of *SCM, Miller Insituform,* and *Westinghouse. See, e.g., SCM,* 645 F.2d at 1206 ("where a patent has been lawfully acquired, subsequent conduct permissible under the patent laws cannot trigger *any* liability under the antitrust laws") (emphasis added). None of the authorities cited by CSU discuss whether. conduct *expressly authorized by law* may be transformed into unlawful conduct if such acts are part of a scheme to monopolize. *See Continental Ore Co. v. Union Carbide & Carbon Corp.,* 370 U.S. 690, 699, 82 S.Ct. 1404, 1410–11, 8 L.Ed.2d 777 (1962) (group boycott); *Poller v. Columbia Broadcasting Sys., Inc.,* 368 U.S.

---

4. Actually, it is unclear from the *Kodak* opinion exactly what documented reason would be sufficient to justify a refusal to deal. Accordingly,

patent holders could rarely refuse to sell their patented products with any comfort that they are in compliance with the law.

**1142**

464, 468–69, 82 S.Ct. 486, 488–89, 7 L.Ed.2d 458 (1962) (same); *Schine Chain Theatres v. United States,* 334 U.S. 110, 119, 68 S.Ct. 947, 952–53, 92 L.Ed. 1245 (1948) (agreements not to compete); *ES Dev., Inc. v. RWM Enterprises, Inc.,* 939 F.2d 547, 555 (8th Cir.1991) (group boycott), *cert. denied,* 502 U.S. 1097, 112 S.Ct. 1176, 117 L.Ed.2d 421 (1992); *Aspen Highlands Skiing Corp. v. Aspen Skiing Co.,* 738 F.2d 1509 (10th Cir. 1984) (refusal to include a competitor's product in package offering, discussed *supra*); *Photovest Corp. v. Fotomat Corp.,* 606 F.2d 704, 719 (7th Cir.1979) (defendant allegedly opened new stores in close proximity to plaintiff's stores for the purpose of putting plaintiff out of business), *cert. denied,* 445 U.S. 917, 100 S.Ct. 1278, 63 L.Ed.2d 601 (1980).

Conduct expressly authorized by one law or governmental agency cannot be simultaneously subject to antitrust scrutiny. The Supreme Court in *Rock Royal* held that if the milk cooperative law and order of the Secretary of Agriculture were "otherwise valid, the fact that their effect would be to give cooperatives a monopoly of the market would not violate the Sherman Act." 307 U.S. at 560, 59 S.Ct. at 1006–07; *see Professional Real Estate,* 508 U.S. at 56–60, 113 S.Ct. at 1925–28 (petitioning of courts protected by First Amendment cannot violate antitrust law unless suit is "objectively meritless"); *F.T.C. v. Ticor Title Ins. Co.,* 504 U.S. 621, 633–35, 112 S.Ct. 2169, 2176–78, 119 L.Ed.2d 410 (1992) (price fixing arrangements authorized by state regulators as a result of actual state involvement is not an antitrust violation). In the patent-antitrust area specifically, courts have held that conduct permissible under the Patent Act is not subject to antitrust scrutiny. *See supra* text at —— and authorities cited therein; *see also Simpson,* 377 U.S. at 24, 84 S.Ct. at 1058 ("The patent laws which give a 17–year monopoly on 'making, using, or selling the invention' are in *pari materia* with the antitrust laws and modify them *pro tanto.*"); *Line Material Co.,* 333 U.S. at 309, 68 S.Ct. at 561–62 ("The Sherman Act was enacted to prevent restraints of commerce but has been interpreted as recognizing that patent grants were an exception."); *United Shoe,* 247 U.S. at 57, 38

S.Ct. at 482 (noting that a patent holder's exercise of its right to exclude others from the use of the invention is "within the field covered by the patent law [and] is not an offense against the Anti–Trust Act").

■ CSU's proposed rule allowing a plaintiff to combine a defendant's lawful and unlawful activities effectively would eliminate the requirement that an antitrust plaintiff must show a "casual connection between the [defendant's] antitrust violations and [plaintiff's] injury." *Continental Ore,* 370 U.S. at 700, 82 S.Ct. at 1411; *see Zenith,* 395 U.S. at 114 n. 9, 89 S.Ct. at 1571 n. 9 ("It is enough that the illegality is shown to be a material cause of the injury"); *National Ass'n of Review Appraisers v. Appraisal Found.,* 64 F.3d 1130, 1135 (8th Cir.1995) (plaintiff "may not recover for losses due to factors other than the [defendant's] anticompetitive violations") (internal citation omitted), *cert. denied,* 517 U.S. 1189, 116 S.Ct. 1676, 134 L.Ed.2d 779 (1996). CSU apparently claims that a single unlawful exclusionary act by a defendant, no matter how trivial or insignificant, can and should subject all of defendant's legitimate competitive activities to antitrust scrutiny. We decline to adopt such a rule. Rather, we conclude that a patent holder is not subject to antitrust liability for exercising its right to refuse to sell or license a patented invention even if the patent holder engages in other allegedly anticompetitive conduct.

### IV. A Copyright Holder Can Unilaterally Refuse To Sell Or License Its Copyrighted Materials.

The principles behind the Patent and Copyright Acts are the same: to encourage the development of works that promote consumer welfare in the long term by granting exclusive rights to the inventor or author. *See Mazer v. Stein,* 347 U.S. 201, 219, 74 S.Ct. 460, 471, 98 L.Ed. 630 (1954) ("The economic philosophy behind the clause empowering Congress to grant patents and copyrights is the conviction that encouragement of individual effort by personal gain is the best way to advance public welfare through the talents of authors and inventors in 'Science and useful Arts.' "); *Data Gener-*

*al,* 36 F.3d at 1186–87 (noting the goals of Copyright Act). In our March 21 Order, we held that a copyright misuse defense is viable "based primarily on the similar policies behind the patent and copyright laws." Mar. 21 Mem. & Order at 17 (citing *Atari,* 975 F.2d at 846 and *Lasercomb,* 911 F.2d at 976); *see also Sony Corp. of Am. v. Universal City Studios, Inc.,* 464 U.S. 417, 439, 104 S.Ct. 774, 787, 78 L.Ed.2d 574 (1984) (there is a "historic kinship between patent law and copyright law"). CSU concedes that patents and copyrights should be treated similarly for antitrust purposes, although CSU disagrees with the rule of law to be applied. Moreover, the Ninth Circuit in *Kodak* itself did not differentiate between patents and copyrights in analyzing the lawfulness of a manufacturer's refusal to deal.

■ We found previously that Xerox's unilateral refusal to license or sell its copyrighted products could constitute unlawful exclusionary conduct if the scope of Xerox's copyrights is limited to the parts market and there are separate antitrust markets for parts and service. *See* Mar. 21 Mem. & Order at 18–19. This rule of law could effectively limit the scope of a copyright holder's protection to a single relevant antitrust market. A copyright holder, however, receives protection for his "expression." A copyright holder "may refrain from vending or licensing [its product] and content [itself] with simply exercising the right to exclude others from using [its] property." *Data General,* 36 F.3d at 1186 (quoting *Fox Film Corp. v. Doyal,* 286 U.S. 123, 127, 52 S.Ct. 546, 546–47, 76 L.Ed. 1010 (1932)); *see, Stewart v. Abend,* 495 U.S. 207, 228–29, 110 S.Ct. 1750, 1763–64, 109 L.Ed.2d 184 (1990) ("But nothing in the copyright statutes would prevent an author from hoarding all of his works during the term of the copyright. In fact, this Court has held that a copyright owner has the capacity arbitrarily to refuse to license one who seeks to exploit the work."). The Copyright Act gives copyright holders the exclusive right to reproduce and distribute its works. *See* 17 U.S.C. §§ 106, 501. We find nothing in the Copyright Act which limits a copyright holder's right to exclude to a single relevant antitrust market. A copyright holder's right to exclude is limited by the scope of protectable expression that is stated in the copyright, not by an analysis of the relevant antitrust markets. In reaching this conclusion, the court adopts by reference its discussion of why a patent holder's right to exclude is limited by the patent claims, not the relevant antitrust markets. *See supra* text at 7–20; July 17 Mem. & Order at 2; Apr. 8 Mem. & Order at 19–22. Accordingly, Xerox's unilateral refusal to license its copyrights does not constitute either copyright misuse or unlawful exclusionary conduct under the antitrust laws. Other courts have reached similar results. *See Triad Systems Corp. v. Southeastern Exp. Co.,* 64 F.3d 1330, 1337 (9th Cir.1995) (rejecting copyright misuse defense based on manufacturer's refusal to license diagnostic software to ISOs), *cert. denied,* 516 U.S. 1145, 116 S.Ct. 1015, 134 L.Ed.2d 96 (1996); *Service & Training, Inc. v. Data General Corp.,* 963 F.2d 680, 690 (4th Cir.1992) ("appellants have offered no evidence that Data General did anything beyond limiting the use of the software to repair and maintenance of specific computer hardware, activity that is protected as an exclusive right of a copyright owner"); *Advanced Computer Services of Michigan, Inc. v. MAI Systems Corp.,* 845 F.Supp. 356, 368–69 (E.D.Va.1994) (rejecting copyright misuse defense because "[i]t is within MAI's discretion to protect its copyrighted works, and this discretion includes the right to license its software to whomever it chooses"). As with patents, a copyright holder's intent and other activities are irrelevant in the determination of the lawfulness of a refusal to deal.

CSU argues that a refusal to license a copyright cannot be treated in the same manner as a refusal to license a patent because the Copyright Act does not contain a similar statutory provision to section 271(d)(4) of the Patent Act. CSU maintains that section 271(d)(4) was a principal basis of our prior holding regarding patents. Although section 271(d)(4) lends additional support and is consistent with our ruling on patents, we would reach the same result in the absence of section 271(d)(4). *See, e.g., SCM, supra* (decided before section 271(d)(4) was added); *Miller Insituform, supra* (same).

■ For all of the above reasons, we hold that if a copyright is lawfully acquired, a copyright holder's unilateral refusal to sell or license its copyrighted expression does not constitute unlawful exclusionary conduct under the antitrust laws or copyright misuse. A copyright holder can exercise its right to exclude others from using the protected expression, even if the exclusion impacts competition in more than one relevant antitrust market. A copyright holder's intent and any other alleged exclusionary acts are irrelevant in determining the lawfulness of a unilateral refusal to license a copyright.

IT IS THEREFORE ORDERED that the motion of CSU, L.L.C., for reconsideration of the court's April 8 and July 17, 1997 orders (Doc. # 664) is denied.

IT IS FURTHER ORDERED that Xerox's motion for reconsideration of the court's March 19 and 21, 1997 Orders (Doc. # 666) is granted. The court's March 19 and 21, 1997 Orders (Doc. 571 and 572) are modified as discussed herein.